UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
VALTUS CAPITAL GROUP, LLC,              :
                                        :
                      Plaintiff,        :       19cv4737 (DLC)
                                        :
           -v-                          :       OPINION AND ORDER
                                        :
PARQ EQUITY LIMITED PARTNERSHIP, PARQ   :
HOLDINGS LIMITED PARTNERSHIP, PARQ      :
VANCOUVER LIMITED PARTNERSHIP, PARQ     :
VANCOUVER ULC, and 1010094 B.C. LTD.,   :
                                        :
                      Defendants.       :
                                        :
----------------------------------------X

APPEARANCES

For plaintiff:
Joseph B. Schmit
Richard Weingarten
Phillips Lytle LLP
340 Madison Avenue, 17th Floor
New York, New York 10173
(212) 759-4888

For defendants:
Thomas J. Hall
Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 318-3000

DENISE COTE, District Judge:

     Valtus Capital Group, LLC ("Valtus") brings this action

against Parq Equity Limited Partnership ("PELP") and its

affiliates (together, "the Company") for breach of a 2017

Private Placement Agreement ("PPA") pursuant to which Valtus

secured CAD $272 million in financing for one of the Company's

subsidiaries.[1]  The PPA entitles Valtus to a fee equal to 2.125% of the "gross proceeds" of any "offer and sale" of the Company's "equity" or "equity-linked securities."  Valtus contends that it is entitled to a fee based on the entirety of the CAD $272 million transaction, which was executed through five related financing agreements and resulted in the investor obtaining control of 55% of the Company.

The Company admits that it has obligations to Valtus under three of those five agreements, but has moved to dismiss the claims related to two of the agreements, arguing that neither of those agreements constitute sales of "equity-linked securities" for which Valtus may recover a fee.  In addition, the Company moves to dismiss Valtus's claim for attorneys' fees.  For the following reasons, the Company's motion to dismiss is granted in part.  Valtus has adequately pled a claim for breach of contract based on the full value of CAD $272 million transaction.  Its claim for attorneys' fees, however, is dismissed.

### Background

The following facts are taken from the Second Amended Complaint ("SAC") and various agreements integral to the SAC. Valtus is a registered broker-dealer and provides financial and

---

[1] "CAD" is an abbreviation for Canadian dollars, the official currency of Canada.

capital-raising services.  The Company comprises various

Canadian entities and investment vehicles owned or controlled by

PELP.  PELP's subsidiaries include Parq Holdings Limited

Partnership ("PHLP"), whose principal asset is Parq Vancouver

("Parq"), a CAD $800 million development in Vancouver, Canada

comprising, among other things, two hotels and two casino

floors.

In 2017, Parq was in financial distress.  Accordingly, the

Company engaged Valtus, together with Credit Suisse (USA)

Securities ("Credit Suisse"), to raise capital for Parq's

general and corporate purposes.  The parties memorialized the

engagement on November 10, 2017 in the PPA.

The Private Placement Agreement

Under the PPA, Valtus agreed to assist the Company in

raising capital by soliciting, negotiating, and structuring a

Private Placement.  The PPA defines "Private Placement" as "any

proposed offer and sale by the Company of equity (including

preferred stock and limited partnership interests or units) or

equity-linked securities of the Company ("Securities") . . . ."

(Emphasis supplied.)  The terms "offer" and "sale" are defined

by reference to Section 2(a)(3) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77b(a)(3).  The Securities Act

defines "offer" to "include every attempt to offer to dispose

of, or solicitation of an offer to buy, a security or interest

3

in a security, for value."  15 U.S.C. § 77b(a)(3).  It defines "sale" or "sell" to "include every contract or sale or disposition of a security or interest in a security, for value." <u>Id.</u>

In exchange for securing a "Private Placement," the Company agreed to pay Credit Suisse and Valtus each one half of the "placement fee."  As set forth in the PPA, that total placement fee "shall be equal to 4.25% of the gross proceeds of any Private Placement of Securities . . . ."  Gross proceeds are defined as "the price paid for Securities" and are "not based on enterprise value."

The Company also agreed to pay Valtus promptly any fees it earned in connection with the engagement.  Under the PPA, any earned fees "shall be paid at the closing of the Private Placement in full or, in the event multiple fundings are contemplated in the subscription agreements or purchase agreements, at the closing of each such funding but calculated based only on the proceeds raised on the date of each such closing."  The PPA also required the Company to reimburse Valtus's reasonable expenses and to indemnify Valtus from certain liabilities.

<u>The Westmont Transaction</u>

Valtus introduced the Company to Westmont Hospitality Group and its affiliates (together, "Westmont").  After substantial

negotiations, Valtus structured a transaction in which Westmont ultimately agreed to provide CAD $272 million in financing to the Company in exchange for a fully diluted ownership interest in the Company equal to 55% and three of five seats on the Company's board of directors (the "Westmont Transaction").[2]

The Westmont Transaction was negotiated, amended, and executed in phases between August 2018 and May 2019. On August 30, 2018, Westmont and the Company executed a term sheet ("August Term Sheet") for a CAD $260 million investment in Parq.[3] The CAD $260 million investment comprised two loans, a CAD $20 million "Bridge Loan" and a CAD $240 million "Second Lien Loan." As envisioned under the August 30 Term Sheet, the Bridge Loan and the Second Lien Loan would be convertible into equity positions of 20% and 31%, respectively, for an aggregate position equal to 51% control of the Company.

---

[2] The Westmont Transaction initially contemplated a total investment of CAD $260 million in exchange for control of 51% of the Company.

[3] The August 30 Term Sheet states that, except with respect to certain provisions such as confidentiality, legal fees, and governing law, it "does not purport to be and does not constitute a binding agreement." It further provides, however, that "[u]pon the closing of the Bridge Loan, each of the terms of provisions of this Term Sheet shall become binding and enforceable against each of the parties hereto and their respective affiliates absent any further documentation to the contrary signed by each of the parties." The Term Sheet contains a choice-of-law provision that states it shall be governed by the laws of the Province of Ontario.

On September 27, 2018, Westmont and the Company executed the Bridge Loan.  By its terms, the Bridge Loan is convertible into equity if, and only if, the parties consummate the Second Lien Loan.  Section 4(a) of the Bridge Loan provides,

> If, on or prior to the Maturity Date, and while the Obligations remain unpaid: (i) PELP and Westmont receive the Bridge Conversion Approvals; and (ii) the second anniversary of the Second Lien Loan Closing Date has occurred (the "Conversion Event"), then (and only following satisfaction of the foregoing conditions precedent) this Note will be automatically converted into the Prescribed Units without further action required on the part of Westmont or PELP (the "Conversion").

(Emphasis omitted.)  The Bridge Loan further provides that conversion of the "Prescribed Units" would result in Westmont holding a 20 percent fully diluted ownership interest in the Company.  On the same day the Bridge Loan was executed, Westmont and the Company also executed an amended version of the Term Sheet ("September Term Sheet").[4]  Among other things, the September Term Sheet reflects amendments based on the terms of the Bridge Loan and the need for interim advances of the Second Lien Loan.

On December 27, 2018, Westmont funded CAD $15 million as an interim advance of the Second Lien Loan ("First Interim Advance").  The First Interim Advance provides that, upon the

---

[4] The SAC asserts that the September Term Sheet became binding upon the closing of the Bridge Loan.

closing of the Second Lien Loan, "the Obligations under this Note . . . will be automatically converted into a portion of the principal amount under the Second Lien Loan without any further action required on the part of Westmont or PELP . . . ." Upon that conversion, the First Interim Advance provides that its obligations "shall be extinguished" and Westmont "shall surrender th[e] Note to PELP for cancellation."

In early March 2019, it became apparent that the Company would not be able to close the Second Lien Loan before the expiration of a March 31, 2019 deadline. The Company received an extension in mid-March, and, with Valtus's assistance, negotiated an additional CAD $12 million interim advance of the Second Lien Loan ("Second Interim Advance").[5] The Second Interim Advance, like the Bridge Loan, is convertible into equity only if "the Second Lien Loan, the New Third Lien Loan and the Aareal Senior Loan have closed and funded . . . ."[6] The Second Interim Advance provides that, "upon completion of the Conversions provided for herein, Westmont will own 25% of the PELP Units (on

---

[5] Of this CAD $12 million, only CAD $9 million was required to be funded on April 1. The Second Interim Advance provided that the remaining CAD $3 million shall not be funded until the closing of the Second Lien Loan.

[6] As explained below, the Second Lien Loan was subsequently bifurcated into the Second Lien Loan and the Third Lien Loan. The Aareal Senior Loan is not defined in the Second Interim Advance.

a fully diluted basis) as a result thereof, in addition to those provided for in the Bridge Note and the Third Lien Note."

On April 5, 2019, the parties amended the Term Sheet for the last time. The April 5, 2019 Term Sheet ("Term Sheet") includes, among other things, a provision to bifurcate the Second Lien Loan into a CAD $229.3 million Second Lien Loan and a CAD $10.8 million "Third Lien Loan." It also states that, assuming all conversions provided for in the Westmont Transaction, "[Westmont's] fully diluted ownership of PELP would be 55% of the outstanding PELP Units on a fully diluted basis . . . ."

Both the Second Lien Loan and the Third Lien Loan closed on May 7, 2019. Like the Bridge Loan and the Second Interim Advance, the Third Lien Loan provides for an equity conversion under certain conditions -- namely, (i) the receipt of "Conversion Approvals on or prior to the Maturity Date" and (ii) the occurrence of "the third anniversary of the Closing Date" of the Third Lien Loan.[7] It provides that, "assuming the conversion of the Bridge Loan, the Second Interim Advance Note and conversion of the full amount [provided in the Third Tier

---

[7] Although the Third Lien Loan did not expressly condition its equity conversion on the closing of the Second Lien Loan, the closing date for the Second Lien Loan was the same date as for the Third Lien Loan.

Loan]," Westmont's fully diluted ownership in the Company would equal 55%.

The closing of the Second Lien Loan was expressly conditioned on the completion of other elements of the Westmont Transaction, including conversions of the equity interests granted in the Bridge Loan, Second Interim Advance, and the Third Lien Loan.[8]  Under Article 3 of the Second Lien Loan, the Company made the following representation:

> All securities issuable upon the conversion of any portion of the obligations owing under each of the Bridge Loan Note, the Second Interim Note and the Third Lien Note pursuant to their respective terms shall be, upon issuance, validly issued, fully paid . . . and non-assessable, issued without violation of any preemptive or similar rights and are free and clear of all taxes, liens and charges.

The Company's obligation to comply with this representation was emphasized throughout the Second Lien Loan.  Article 5 of the Second Lien Loan contained a negative covenant prohibiting the Company from taking any action to "avoid or seek to avoid the observance or performance of any of the terms in the Bridge Loan Note, the Second Interim Note or the Third Lien Note relating to the conversion of all or any portion of the obligations owing thereunder into units or other equity interests in PELP . . . ."

---

[8] The closing of the Second Lien Loan was also conditioned on an amendment to the Company's shareholder agreement "to provide for, among other things, not less than three (3) nominee positions by a [Westmont] Entity on the governing board of PEGP, which shall contain no more than five (5) nominees in total."

Under Article 6, the Company's failure to timely complete "any conversion as provided in any of the Bridge Loan Note, the Second Interim Note or the Third Lien Note" shall be deemed an "event of default."

The Second Lien Loan also contains a broad integration clause, which incorporates other agreements entered into in connection with the Second Lien Loan. That clause states,

> This Agreement, the other Loan Documents and the subject matter hereof constitute the entire contract between the Parties relative to the subject matter hereof and any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.[9]

A summary of the agreements that comprise the Westmont Transaction is provided in the following chart.

| The Westmont Transaction | | |
|---|---|---|
| Agreement | Closing Date | Principal Amount (in CAD) |
| Bridge Loan | September 27, 2018 | $20,000,000.00 |
| First Interim Advance | December 27, 2018 | $15,000,000.00 |
| Second Interim Advance | April 2, 2019 | $12,000,000.00 |
| Second Lien Loan | May 7, 2019 | $266,756,615.13 (including fees) |
| Third Lien Loan | May 7, 2019 | $10,832,015.99 |

---

[9] "Loan Documents" is a broadly defined term in the Second Lien Loan.

Procedural History

At each stage of the Westmont Transaction, Valtus demanded payment of its earned fees under the PPA. Although the Company has never disputed that Valtus is entitled to a fee in connection with the Bridge Loan, the Second Interim Advance, and the Third Lien Loan, it has not remitted payment of any fee to Valtus.

On April 19, 2019, Valtus sued the Company in the Supreme Court of New York, County of New York, for breach of the PPA. Following service on the defendants, Valtus filed an amended complaint on May 14. On May 22, the Company removed this diversity action to this Court.

On June 21, the Company filed a motion to dismiss in part the amended complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. Valtus filed its SAC on July 16, and the Company renewed its motion to dismiss on July 26. The Company's motion to dismiss became fully submitted on August 30.

On August 16, Valtus filed a motion for partial summary judgment pursuant to Rule 56(a), Fed. R. Civ. P., on the basis of admissions in the Company's motion. Valtus's motion for partial summary judgment became fully submitted on September 6 and is addressed in an Order also issued today.

## Discussion

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Geffner v. Coca-Cola Co., 928 F.3d 198, 199 (2d Cir. 2019) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Charles v. Orange County, 925 F.3d 73, 81 (2d Cir. 2019) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Empire Merchants, LLC v. Reliable Churchill LLLP, 902 F.3d 132, 139 (2d Cir. 2018). The plaintiff must plead enough facts to "nudge[] [his] claims across the line from conceivable to plausible . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), Fed. R. Civ. P., a court must "constru[e] the complaint liberally, accept[] all factual allegations as true, and draw[] all reasonable inferences in the plaintiff's favor." Coalition for Competitive Electricity, Dynergy Inc. v. Zibelman, 906 F.3d 41, 48-49 (2d Cir. 2018) (citation omitted). "A complaint is . . . deemed to include any written instrument attached to it as an

12

exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sierra Club v. Con-Strux, LLC, 911 F.3d 85, 88 (2d Cir. 2018) (citation omitted).

The Company moves to dismiss in part Valtus's breach of contract claim to the extent it seeks a fee in connection with the First Interim Advance and the Second Lien Loan. It also moves to dismiss Valtus's claim for attorneys' fees. Each of these issues is addressed in turn.

I. Breach of the Private Placement Agreement

Valtus asserts that, under the terms of the PPA, it is entitled to a fee based on the entirety of the Westmont Transaction -- including the First Interim Advance and the Second Lien Loan. The parties agree that New York law controls this claim.[10]

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d

---

[10] The PPA contains a New York choice-of-law provision and the parties have relied exclusively on New York law in their motion papers. It is unnecessary to consider, therefore, the impact of the choice-of-law provision in the Second Lien Loan providing for British Columbia law. Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009).

Cir. 2017) (citation omitted).  Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties."  In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017).  If the intent of the parties is clear from the four corners of a contract, its interpretation is a matter of law for the court.  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 316 (2d Cir. 2006).

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous."  In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted).  By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion."  Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the

14

unambiguous terms of the agreement itself." <u>Torres v. Walker</u>,

356 F.3d 238, 245 (2d Cir. 2004) (citation omitted).  In

interpreting contracts, "words should be given the meanings

ordinarily ascribed to them and absurd results should be

avoided." <u>Mastrovincenzo v. City of New York</u>, 435 F.3d 78, 104

(2d Cir. 2006) (citation omitted).  When multiple contracts are

at issue, "all writings which form part of a single transaction

and are designed to effectuate the same purpose must be read

together, even [if] they were executed on different dates and

were not all between the same parties." <u>TVT Records v. Island</u>

<u>Def Jam Music Group</u>, 412 F.3d 82, 89 (2d Cir. 2005) (citation

omitted).[11]

Under the PPA, Valtus is entitled to one half of 4.25% of

the "gross proceeds" of any "offer and sale" of "equity" or

"equity-linked securities."  Because the Company admits it owes

_____

[11] Although the parties have relied on New York law, the
principles of British Columbia contract law largely align with
New York contract law.  Words in a contract "must be given their
primary meaning," <u>Rickards Estate v. Diebold Election Sys. Inc.</u>
(2007), 69 B.C.L.R. 4th 75, ¶ 22 (Can. B.C.C.A.) (citation
omitted), and should be construed in a manner "consistent with
the intention of the parties as disclosed in relation to the
contract as a whole." <u>Compagnie francaise du Phénix v.</u>
<u>Travelers Fire Ins. Co.</u>, [1952] 2 S.C.R. 190, ¶ 116.  While
British Columbia courts may consider the "factual matrix" that
provides context to a dispute, it is the text of a contract that
must remain "in the foreground." <u>Black Swan Gold Mines Ltd. v.</u>
<u>Goldbelt Res. Ltd.</u> (1996), 25 B.C.L.R.3d 285, ¶¶ 12, 19 (Can.
B.C.C.A.); <u>see also</u> <u>Glaswegian Enters. Inc. v. BC Tel Mobility</u>
<u>Cellular, Inc.</u> (1997), 49 B.C.L.R.3d 317, ¶¶ 18-20 (Can.
B.C.C.A.)).

Valtus a fee in connection with the Bridge Loan, the Second Interim Advance, and the Third Lien Loan, the crux of the parties' dispute concerns the proper construction of these terms as applied to the Second Lien Loan, into which the First Interim Advance automatically converted. In its motion, the Company contends that the Second Lien Loan does not involve a "sale" of "equity-linked securities" because none of the financing provided in the Second Lien Loan can convert into equity.

Valtus has stated a claim for breach of contract based on the Company's failure to remit a fee in connection with the First Interim Advance and the Second Lien Loan. The SAC has adequately pleaded that the multiple contracts at issue here are part of a single transaction to obtain financing for the Company to address Parq's financial distress. Valtus, working on the Company's behalf pursuant to the PPA, was instrumental in obtaining over CAD $250 million through the Westmont Transaction to rescue the Company. As part of the transaction, Westmont obtained equity control of the company. While the Second Lien Loan provided (as its name suggests) a loan, that loan was conditioned on the Company's representation that the convertible equity in the Bridge Loan, Second Interim Advance, and Third Lien Loan had "validly issued." Likewise, any failure by the Company to timely complete the equity conversions would be deemed an "event of default" under the Second Lien Loan.

Viewing the Westmont Transaction as a whole, as New York law contemplates, the SAC pleads that none of the financing Westmont provided could convert into equity unless the Second Lien Loan closed.  Accordingly, the SAC adequately pleads that the Second Lien Loan qualifies as a sale of securities "linked" to the delivery of the equity interests provided in the Bridge Loan, the Second Interim Advance, and the Third Lien Loan.[12] With this understanding of the Westmont Transaction, the SAC also adequately pleads that financing provided through the Second Lien Loan was part of the "gross proceeds" -- i.e., the price Westmont paid -- for the equity control it obtained through the conversion of the Bridge Loan, the Second Interim Advance, and the Third Lien Loan.

The Company argues that the presence of an integration clause in the Second Lien Loan prohibits Valtus from relying on the terms of the Bridge Loan, the Second Interim Advance, and the Third Lien Loan.  This argument is misplaced.  It is the Second Lien Loan itself that refers to those contracts. Considering each of them is necessary to understand what the parties intended in executing the Second Lien Loan.  Moreover,

---

[12] Although the Third Lien Loan did not expressly condition its equity conversion on the closing of the Second Lien Loan, the two transactions closed simultaneously.  When viewed in the context of the Westmont Transaction as a whole, it is apparent that the closing of the Third Lien Loan would not have occurred but for the closing of the Second Lien Loan.

that integration clause expressly incorporates all Loan Documents, which is a broadly defined term.

The Company next argues that, even if the Second Lien Loan is linked to equity, it was not a "sale" of an equity-linked security because the loan itself must be repaid. This argument is also misplaced. The PPA incorporates a broad definition of "sale" from the Securities Act, which includes "every contract or sale or disposition of a security or interest in a security, for value." See 15 U.S.C. § 77b(a)(3). As the Company concedes, the Bridge Loan, the Second Interim Advance, and the Third Lien Loan each qualify as sales of equity-linked securities. This is so even though those loans provide for repayment in the event they were not timely converted into equity. The conditions of conversion included the closing of the Second Lien Loan. Accordingly, the SAC adequately pleads that the Second Lien Loan constitutes a "sale" of equity-linked securities.

II. Attorneys' Fees

The Company also moves to dismiss the SAC to the extent Valtus seeks recovery of its attorneys' fees incurred in pursuing this action. "Under New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear."

*NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).[13]  "[C]ourts applying New York law should not infer a party's intention to provide counsel fees as damages for breach of contract unless the intention to do so is unmistakably clear from the language of the contract."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (citation omitted).

Valtus points to two provisions of the PPA, each of which it asserts provide for attorneys' fees if it prevails in this action.  In the first, titled "Expenses; Payments," the Company agreed to "reimburse [Valtus] promptly upon request for reasonable expenses resulting from or arising out of this engagement," including "the reasonable fees and expenses of its legal counsel."  That provision contains limitations, however. Valtus must obtain "the prior written consent of the Company" before incurring any individual expense greater than $10,000 and in no event may the fees and expenses of its legal counsel exceed $100,000.

The second provision to which Valtus points is an indemnification provision containing two clauses.  The first

---

[13] In a diversity case "state law creates the substantive right to attorney's fees."  *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (citation omitted); *see also* *U.S. Fidelity and Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 24, 74 (2d Cir. 2004).

clause provides for indemnification for liabilities "based on any untrue statement or any alleged untrue statement of any material fact contained in the Offering Materials . . . or in any other communication provided by or on behalf of the Company to any Offeree."  The second clause provides for indemnification for liabilities "otherwise relating to or arising out of the engagement, [Valtus's] performance thereof or any other services they are asked to provide to the Company."  Valtus argues that, while the first clause targets third-party claims, the second clause includes Valtus's legal fees in connection with an action to enforce the PPA itself.

Valtus is not entitled to attorneys' fees under any of these provisions.  The "Expenses; Payments" provision provides only for reimbursement of certain expenses in connection with Valtus's efforts to perform under the PPA.  It specifically requires Valtus to obtain the Company's written consent prior to incurring certain legal expenses.  It does not unmistakably evidence the parties' intent to provide for attorneys' fees in an action on the contract.

The indemnification provision likewise does not support a claim for attorneys' fees.  Neither of the clauses in the indemnification provision reference attorneys' fees.  Moreover, to the extent they provide for indemnification, both clauses reflect that the parties were concerned with indemnifying Valtus

against claims brought by third parties.  See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199-200 (2d Cir. 2003) (indemnity clause only related to third-party claims).  Neither the first indemnification clause nor the residual clause is "unequivocally referable to claims between the parties themselves" or sufficiently clear to show that the Company promised "to indemnify [Valtus] for counsel fees in an action on the contract."  Id. at 200 (quoting Hooper Assoc., Ltd. V. AGS Computers, Inc., 74 N.Y.2d 487, 492 (1989)).

## Conclusion

The Company's July 26, 2019 motion to dismiss in part the SAC is granted in part.  Valtus's claim for attorneys' fees is dismissed.


Dated:    New York, New York
          October 9, 2019

                        _____
                              DENISE COTE
                        United States District Judge