UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VALTUS CAPITAL GROUP, LLC,

Plaintiff,

-v-

PARQ EQUITY LIMITED PARTNERSHIP, PARQ HOLDINGS LIMITED PARTNERSHIP, PARQ VANCOUVER LIMITED PARTNERSHIP, PARQ VANCOUVER ULC, and 1010094 B.C. LTD.,

Defendants.

19cv4737 (DLC)

OPINION AND ORDER

APPEARANCES

For plaintiff:
Joseph B. Schmit
Richard Weingarten
Phillips Lytle LLP
340 Madison Avenue, 17th Floor
New York, New York 10173
(212) 759-4888

For defendants:
David Crichlow
Craig Convissar
Kelly D. Hine
Katten Muchin Rosenman, LLP
575 Madison Avenue
New York, NY 10022

DENISE COTE, District Judge:

Valtus Capital Group, LLC ("Valtus") seeks summary judgment on its claim for CAD $4,872,661.39 in investment banking fees and $34,622.17 in expenses from Parq Equity Limited Partnership ("PELP") and its affiliates[1] (together, "the Company") for work Valtus performed pursuant to their 2017 Private Placement Agreement ("PPA"). It is undisputed that Valtus succeeded in securing CAD $272 million in financing for one of the Company's subsidiaries and that the Company owes Valtus $910,180.34 in connection with three of the five tranches of the financing. Valtus contends that it is entitled to a fee based on the entirety of the CAD $272 million transaction, including the tranches known as the First Interim Advance and the Second Lien Loan. These two tranches accounted for over 80% of the capital invested in the Company.

The dispute between the parties ultimately turns on the construction of the phrase "equity-linked securities" in the PPA. Since the investor's receipt of the Company's equity was conditioned upon the investor providing the full financing of CAD $272 million, Valtus has shown that it is entitled to a fee

[1] At the time of the relevant agreement, PELP was owned by affiliates of Dundee Corporation ("Dundee"), PBC Group ("PBC"), and Paragon Gaming ("Paragon"). PBC acquired Paragon's interest in PELP in early-2019.

calculated on the full amount of the financing. Accordingly, Valtus's motion for summary judgment is granted.

**Background**

The following facts are undisputed or taken in the light most favorable to the Company, unless otherwise noted. Valtus, a Nevada company, is a registered broker-dealer and privately-held investment bank.

The Company is comprised of various Canadian entities and investment vehicles owned or controlled by PELP. One of PELP's subsidiaries is Parq Holdings Limited Partnership ("PHLP"), which owns Parq Vancouver ("Parq"). Parq is a development in Vancouver comprising, among other things, two hotels, two casino floors, and multiple restaurants and bars. It opened to the public in September 2017.

The Company engaged Valtus, together with Credit Suisse (USA) Securities ("Credit Suisse"), to raise capital for Parq's general and corporate purposes. Valtus began work on this project in 2016. The parties memorialized the engagement in the November 10, 2017 PPA.

The Private Placement Agreement

Under the PPA, Valtus agreed to assist the Company in raising capital by soliciting, negotiating, and structuring a "Private Placement." In exchange for these services, the Company would "pay Credit Suisse and Valtus a placement fee."

As set forth in the section of the PPA entitled "Compensation," that fee "shall be equal to 4.25% of the gross proceeds of any Private Placement of Securities," with Credit Suisse and Valtus sharing that fee equally. As used in that same section of the PPA, "gross proceeds" means "the price paid for Securities" and is "not based on enterprise value." The PPA defines "Private Placement" as "any proposed offer and sale by the Company of equity (including preferred stock and limited partnership interests or units) or equity-linked securities of the Company ("Securities")." (Emphasis supplied.)

Overview of the Westmont Transaction

Valtus identified Westmont Hospitality Group and its affiliates (together, "Westmont") as a potential funding partner for the project in late 2016. After substantial negotiations, the Company and Westmont structured a transaction in which Westmont agreed to provide CAD $260 million in financing to the Company in exchange for a substantial equity position in the Company. In exchange for its financing, which was ultimately increased to CAD $272 million, Westmont received over 55% of the equity in the Company, and three of five seats on the Company's board of directors.

In May 2018, before the Westmont transaction closed, Geoff Morphy, a Vice President at Dundee, explained the terms of the agreement to Valtus, Credit Suisse, and PELP's other affiliates.

Morphy quoted CAD $11,050,000 -- 4.25% of the total Westmont financing -- as the "Estimated Advisers Costs." This calculation of a fee of 4.25% was quoted by the Company even though, as of that time, the deal structure allowed Westmont to assume equity ownership upfront without any of the principal in the investment converting to equity. The following month, in a June 7, 2018 email to Valtus, Dundee quoted this same figure as the "IB Fees," that is, the investment banking fees.

August 2018 Term Sheet

On August 30, 2018, Westmont and the Company executed a non-binding term sheet (as amended, "Term Sheet") for a CAD $260 million investment in Parq to occur in two tranches. The first tranche of funding was a CAD $20 million Bridge Loan fully convertible into a 20% equity position in the Company. Only CAD $60 million of the second tranche -- a CAD $240 million Second Lien Loan -- would be convertible into equity. Under the August 2018 Term Sheet, Westmont would take a position equal to 51% control of the economics of the Company and would take control of the board of directors.

On September 27, 2018, Westmont and the Company executed the Bridge Loan. It is undisputed that the Bridge Loan is an equity-linked security. After the Bridge Loan closed, the Company's outside counsel circulated the final documents to the entire deal team, including Valtus. It is undisputed that the

investment banking fee in these documents was calculated at 4.25% of the total Westmont investment of CAD $260, or CAD $11,050,000.[2]

September 27 Term Sheet

On the same day the Bridge Loan was executed, Westmont and the Company amended the Term Sheet. The September 27 Term Sheet reflects amendments based on the terms of the Bridge Loan and the need for interim advances on the Second Lien Loan.

In October 2018, the parties prepared a presentation for the Marriott Corporation ("Marriott"), which had to approve the Westmont transaction. The parties agree that CAD $11,050,000 of the "Fees & Expenses" quoted in that presentation were attributable to the investment banking fees.[3]

First Interim Advance

The Company determined that Parq required additional liquidity. As a result, on December 27, 2018, Westmont funded the first advance of the Second Lien Loan with CAD $15 million ("First Interim Advance"). The documentation for the First

---

[2] The "Fees & expenses" listed on the document are quoted as CAD $14,960,000. The Company does not dispute that this included investment banking fees totaling CAD $11,050,000 due to Valtus and Credit Suisse. In addition to the investment banking fees, the Fees & Expenses figure included "legal fees and cushion."

[3] Once again, the "fees & expenses" listed on this document are quoted as CAD $14,960,000. The Company concedes that this figure included CAD $11,050,000 of investment banking fees.

Interim Advance provides that, upon the closing of the Second Lien Loan, "the Obligations under this Note . . . will be automatically converted into a portion of the principal amount under the Second Lien Loan without any further action required on the part of Westmont or PELP." The First Interim Advance provides further that its obligations "shall be extinguished" and Westmont "shall surrender th[e] Note to PELP for cancellation" once it is converted into the principal of the Second Lien Loan.

While the structure of the Westmont transaction shifted, the calculation of the advisors' fees remained constant; the parties were still representing to each other and to third parties that the investment banking fee would be 4.25% of the full Westmont transaction, not just of that portion of the funding that was expressly convertible into equity. The Company repeatedly calculated investment banking fees of CAD $11,050,000 based upon a total investment of CAD $260 million.

A December 2018 presentation by the CEO of PBC for its advisory board quoted the "Fees & Expenses" for the transaction as CAD $14,960,000, of which CAD $11,050,000 would be paid to Valtus and Credit Suisse. Also in December 2018, Morphy based his calculation of investment advisor fees on the total amount of the transaction, including the transaction amount funded through the First Interim Advance. He did so when he circulated

a cash flow analysis to Company affiliates and Westmont in connection with a Funding Request for the First Interim Advance. As part of the analysis, Morphy reported that the Company's financial advisors would be entitled to fees related to both the Bridge Loan and the First Interim Advance. The email reports that the Company's outside counsel had explained that "the obligations to the advisers are contractual and need to be honoured." Morphy also indicated that the enclosed financial analysis, which included the investment banking fees, would be sent to the regulators whose approval was essential for the Westmont transaction.[4]

There is yet another example of the Company calculating the investment advisor fees on an amount that included the First Interim Advance and Second Lien Loan. In February 2019, the Company sent Westmont an update. The update reflected the "fully loaded" fees, which the Company noted had "yet to be negotiated and finalized." The "Advisor Fees" were twice listed as CAD $11,050,000. A footnote explains that this figure is "4.25% on Westmont total investment of [CAD] $260 million." On the same day, Morphy sent a report to PricewaterhouseCoopers ("PWC") listing the same fee calculation, but also quoting an

---

[4] The Company does not dispute that it provided those figures to the regulators.

"Optimistic" scenario that was "being pursued by PBC and Dundee" in which the "Advisor Fee[]s" are calculated as 4.25% of CAD $80 million, or CAD $3,400,000.

Second Interim Advance

On April 1, 2019, the Company and Westmont executed another tranche of funding, a CAD $12 million second interim advance of the Second Lien Loan ("Second Interim Advance"). The Second Interim Advance is convertible into equity only if "the Second Lien Loan, the New Third Lien Loan and the Aareal Senior Loan have closed and funded."[5] The Second Interim Advance provides that "upon completion of the Conversions provided for herein, Westmont will own 25% of the PELP Units (on a fully diluted basis) as a result thereof, in addition to those provided for in the Bridge Note and the Third Lien Note." The Company does not dispute that the Second Interim Advance is an equity-linked security.

April 5, 2019 Term Sheet

On April 5, 2019, the parties amended the Term Sheet for the last time. The April 5 Term Sheet includes, among other things, a provision to bifurcate the Second Lien Loan into a CAD $229.3 million Second Lien Loan and a CAD $10.8 million Third

[5] The Second Lien Loan was later bifurcated into the Second Lien Loan and the Third Lien Loan. The Aareal Senior Loan is not defined in the Second Interim Advance.

Lien Loan, the fifth and final tranche of funding. As explained in the April 5 Term Sheet, "[Westmont's] fully diluted ownership of PELP would be 55% of the outstanding PELP Units on a fully diluted basis," assuming the execution of all equity conversions. The April 5 Term Sheet also stated that "no portion of the Second Lien Loan shall be convertible into PELP Units."

Closing of the Second Lien Loan and the Third Lien Loan

The Second Lien Loan closed on May 7, 2019. The closing of the Second Lien Loan was expressly conditioned on the completion of other elements of the Westmont transaction, including conversions of the equity interests granted in the Bridge Loan, Second Interim Advance, and the Third Lien Loan. The Second Lien Loan lists the Term Sheet, the Bridge Loan, the Second Interim Advance, and the Third Lien Loan as "material contracts" that are "in full force and effect." Under its Article 4, the issuance of the Second Lien Loan required the Company's "Restructuring" by the funding date. "Restructuring," in turn, was defined as "the acquisition by [Westmont] of certain Equity Securities in PELP and PEGP." The Second Lien Loan also required an amendment to the Company's shareholder agreement to grant Westmont three seats on the governing board of the Company.

Westmont's equity acquisition is also the subject of various representations and warranties in the Second Lien Loan. Article 3, for instance, contains the following representation:

> All securities issuable upon the conversion of any portion of the obligations owing under each of the Bridge Loan Note, the Second Interim Note and the Third Lien Note pursuant to their respective terms shall be, upon issuance, validly issued, fully paid . . . and non-assessable, issued without violation of any preemptive or similar rights and are free and clear of all taxes, liens and charges.

Likewise, Article 5 of the Second Lien Loan sets forth a negative covenant prohibiting the Company from taking any action to "avoid or seek to avoid the observance or performance of any of the terms in the Bridge Loan Note, the Second Interim Note or the Third Lien Note relating to the conversion of all or any portion of the obligations owing thereunder into units or other equity interests in PELP." And, under Article 6, the Company's failure to timely complete "any conversion as provided in any of the Bridge Loan Note, the Second Interim Note or the Third Lien Note" shall be deemed an "event of default."

The Third Lien Loan closed and funded on May 9, 2019. Like the Bridge Loan and the Second Interim Advance, it was convertible to equity in the Company. Specifically, it provides that, "assuming the conversion of the Bridge Loan, the Second Interim Advance Note and conversion of the full amount [provided

in the Third Tier Loan]," Westmont's fully diluted ownership in the Company would equal 55%.

The PPA required the Company to pay the investment banking fees "at the closing of the Private Placement in full or, in the event multiple fundings are contemplated . . . , at the closing of each such funding." Nonetheless, the Company has never made any payment of any fees to Valtus. This is true even though the Company does not dispute that Valtus is entitled to a fee in connection with the Bridge Loan, the Second Interim Advance, and the Third Lien Loan.

The structure of the Westmont transaction is summarized in the chart below:

| The Westmont Transaction | | |
|---|---|---|
| Agreement | Closing Date | Principal Amount (in CAD) |
| Bridge Loan | September 27, 2018 | $20,000,000.00 |
| First Interim Advance | December 27, 2018 | $15,000,000.00 |
| Second Interim Advance | April 2, 2019 | $12,000,000.00 |
| Second Lien Loan | May 7, 2019 (Funded May 9, 2019) | $214,301,712.60 |
| Third Lien Loan | May 9, 2019 | $10,832,015.99 |

Procedural History

On April 19, 2019, Valtus sued the Company in the Supreme Court of the State of New York, County of New York, for breach of the PPA. On May 22, the Company removed this diversity

action to this Court. An Opinion of October 9 denied the Company's motion to dismiss Valtus's claims for breach of the PPA related to the First Interim Advance and the Second Lien Loan, but dismissed Valtus's claim for attorneys' fees under the PPA. Valtus Capital Grp., LLC v. Parq Equity Ltd. P'ship, 2019 WL 5067179, at *1 (S.D.N.Y. Oct. 9, 2019). An Order issued that same day granted Valtus's motion for partial summary judgement for fees from the Bridge Loan, the Second Interim Advance, and the Third Lien Loan, finding that Valtus was due fees for those financing agreements in the amount of $910,180.34 plus prejudgment interest. An Order of June 16, 2020 denied Valtus's motion for an entry of partial final judgment pursuant to Rule 54(b), Fed. R. Civ. P.

Valtus filed this motion for summary judgment on May 29, 2020. The Company opposed Valtus's motion and filed a cross-motion on June 29. The motions were fully submitted on August 19.

## Discussion

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the record taken as a whole could

not lead a rational trier of fact to find for the non-moving party." Smith v. Cnty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015). In making this determination, the court "draws all inferences in favor of the nonmoving party." Id. When deciding cross-motions for summary judgment, the court must construe the evidence in each case in the light most favorable to the non-moving party. Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir. 2018).

Once the moving party has made a showing that the non-movant's claims cannot be sustained, the party opposing summary judgment "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment." Ridinger v. Dow Jones & Co., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material

if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

The elements of a breach of contract action in New York are well-established.[6] They are "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011) (citation omitted).

Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." In re MPM Silicones, 874 F.3d 787, 795 (2d Cir. 2017). If the intent of the parties is clear from the four corners of a contract, the court may determine the agreement's meaning on summary judgment. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).

[6] Valtus's breach-of-contract claim rests on an interpretation of the PPA. The PPA contains a choice-of-law provision stating that it should be interpreted in accordance with New York law. The Second Lien Loan and Third Lien Loan specify that they should be read in accordance with British Columbia law, while the Bridge Loan, First Interim Advance, and Second Interim Advance designate Ontario law as controlling. The parties rely exclusively on New York authorities in the briefing of these summary judgment motions. An agreement between the parties to apply New York law, even where that agreement is implicit, is sufficient to establish the appropriate choice of law. Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000); see also Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011).

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." In re MPM Silicones, 874 F.3d at 795.

> An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.

Law Debenture Tr. Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (citation omitted). By contrast, a contract is unambiguous if its "language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 69 (2d Cir. 2014).

"If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Torres v. Walker, 356 F.3d 238, 245 (2d Cir. 2004) (citation omitted). In interpreting contracts, "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted). "[T]he court is to consider its particular words not in isolation but in the light of the obligation as a whole and the intention of the parties as

manifested thereby . . . ." JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009) (citation omitted). "In determining whether the contract is ambiguous, a court looks at the contract as a whole in light of the circumstances present when the contract was entered." Steiner v. Lewmar, Inc., 816 F.3d 26, 33 (2d Cir. 2016) (citation omitted).

Ambiguity does not arise merely by virtue of the fact that the parties volunteer different definitions. Law Debenture Tr., 595 F.3d at 467. For instance, the proposal of an interpretation that "strains the contract language beyond its reasonable and ordinary meaning" does not create ambiguity where none otherwise exists. Seiden Associates, Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (citation omitted).

If a contract is ambiguous and "the intent of the parties cannot be determined from the contractual language itself, the ambiguity presents a question of fact" to be resolved at trial. Hoyt v. Andreucci, 433 F.3d 320, 331 (2d Cir. 2006). If a contract is unambiguous, by contrast, its meaning is "a question of law for the court to decide." JA Apparel Corp., 568 F.3d at 397.

> Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary.

New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 115 (2d Cir. 2010) (citation omitted). "Similarly, summary judgment may be granted despite any ambiguities in the contract where there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." Id. (citation omitted).

When multiple contracts are at issue, "all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even [if] they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted). "As to whether the parties assented to all the promises as a single whole, the test is whether there would have been no bargain whatever, if any promise or set of promises were struck out." Novick v. AXA Network, LLC, 642 F.3d 304, 312 (2d Cir. 2011) (citation omitted). "[I]f the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." TVT Records, 412 F.3d at 89.

I. The Private Placement Agreement Is Unambiguous.

Valtus has shown that the PPA is unambiguous. When read in context, it requires that Valtus be paid a fee calculated on the

entirety of the Westmont transaction and not just three of its five tranches.

As quoted above, the PPA requires that the fee be a percentage of the gross proceeds of any private placement of securities. A "Private Placement" is defined as "any proposed offer and sale by the Company of equity (including preferred stock and limited partnership interests or units) or equity-linked securities of the Company." Consequently, the parties agree that a determination of the meaning of "equity-linked securities" is critical to the resolution of the Valtus motion for summary judgment.

The law requires that the phrase "equity-linked securities," like every other component of the PPA, be construed in reference to the entire PPA and to the other agreements that comprise the Westmont transaction. Indeed, whether any of the five tranches of the Westmont investment is an equity-linked security necessarily requires an examination of each of those investments. Those additional documents provide the commercial context of the PPA and the PPA is inextricably tied to them. Critically, that context underscores the numerous ways in which the Second Lien Loan and First Interim Advance were essential to the Company receiving the Westmont investment and to Westmont receiving in turn its equity stake in the Company and control over the Company's board.

As those documents make plain, the intent of the parties was to structure a single, integrated CAD $272 million deal. As importantly, the agreements were explicitly conditioned on each other.

The Second Lien Loan is replete with representations and warranties that guarantee the equity conversion of the Bridge Loan, the Second Interim Advance, and the Third Lien Loan. The Second Lien Loan depended upon the Company's representation that the convertible equity in the Bridge Loan, Second Interim Advance, and Third Lien Loan had "validly issued." Likewise, any failure by the Company to timely complete the equity conversions provided in those loans would be deemed an "event of default" under the Second Lien Loan. The closing of the Second Lien Loan, in turn, was a condition of the equity conversion of the other agreements. The Bridge Loan and the Second Interim Advance make this plain, describing the two-year anniversary of the Second Lien Loan closing date as a condition precedent to equity conversion. The obligations under those agreements are therefore tied to the closing of the Second Lien Loan and vice versa.

The First Interim Advance, like the Second Lien Loan, is equity linked because without it, no equity would issue.[7] As

[7] Dictionary definitions of the term "linked" support Valtus's construction. "[I]t is common practice for the courts of [New

explained above, the principal amount of the First Interim Advance converted into the principal of the Second Lien Loan when the latter closed. When that occurred, the obligations associated with the First Interim Advance were extinguished and terms of the Second Lien Loan, including those related to the equity conversion, governed.

The conditions in which these agreements were executed confirm this reading. When the financing agreements were executed, the Company needed a substantial infusion of liquidity to complete the Parq project. From the outset, the Westmont transaction was structured to give Westmont a substantial position in the Company in exchange for a CAD $260 million -- later CAD $272 million -- investment. As the transaction progressed, the Company required periodic infusions of cash. But again, each of those intermediate infusions of capital was conditioned upon the closing of the Second Lien Loan. Those interim fundings were not freestanding contracts, but accelerations of that larger investment. Dividing the Westmont

---

York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 119 (2d Cir. 2011) (citation omitted). The online edition of the Oxford English Dictionary defines the adjective "linked" as "joined, coupled, associated." Using that definition, a security that is a condition precedent to the issuance of equity is "linked" to equity.

transaction into intermediate payments did not transform it into a series of discrete, independent deals; it simply reconfigured the timing of the financing. Valtus has shown, therefore, that it is entitled to summary judgment since each of the five tranches of the Westmont investment in the Company was an equity-linked security.

The Company's own cross motion and its opposition to Valtus's motion rely on the same argument: the Second Lien Loan and the First Interim Advance are not "equity-linked" because they do not themselves convert directly to equity. The Company argues that these two instruments are stand-alone debt securities, wherein the principal, plus interest, is repaid in money rather than shares of the Company. This argument blinks reality, ignores critical provisions of the instruments, and fails for the reasons just explained.

The Company submits that its construction of the term "equity-linked" aligns with the specific meaning of the phrase within investment banking. Its expert, Roberts Brokaw III, opines that within investment banking an equity-linked security "involves a security entailing potential issuance of a company's common stock."[8]

[8] Valtus briefly questions Mr. Brokaw's qualifications to offer testimony. Under Rule 702, Fed. R. Evid., an expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702; Restivo v. Hessemann, 846 F.3d

"Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014); see also Law Debenture Tr., 595 F.3d at 466 (citation omitted) ("[P]roof of custom and usage consists of proof that the language in question is fixed and invariable in the industry in question."). The party asserting that an industry custom or term of art renders a contract unambiguous must show that the meaning is "so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to both contracting parties and that they contracted in reference thereto." Id. (citation omitted).

The Company asserts that the Brokaw Report demonstrates that the industry's definition of "equity-linked securities" excludes debt offerings without conversion language. Not so. While Mr. Brokaw explains that a security with express conversion rights is one form of an equity-linked security, he does not opine that it is the only form of security that can be linked to equity. And his definition of an equity-linked security would include a security like the Second Lien Loan, whose closing is a condition precedent to the issuance of stock.

547, 575-76 (2d Cir. 2017). It is assumed for the purposes of this motion that Mr. Brokaw is qualified as an expert.

Mr. Brokaw does opine that the First Interim Advance and Second Lien Loan are not equity-linked securities. But that naked assertion, unsupported by any persuasive analysis, is insufficient to create a factual dispute. See Dalberth v. Xerox Corp., 766 F.3d 172, 189 (2d Cir. 2014) (citation omitted) ("[A]n expert's report is not a talisman against summary judgment."). Indeed, the Brokaw Report does not grapple with the explicit terms of the relevant documents. For instance, it states that the Second Lien Loan "acknowledges" the conversion features of the other securities. But the Second Lien Loan does more than "acknowledge" that other financing agreements have conversion features. Fulfillment of the equity conversion is a material term of that agreement. And, the closing of the Second Lien Loan is a condition of the conversion occurring.

Finally, the Company argues that the financing agreements do not explicitly state that they are all part of a single, integrated transaction. But there is no incantation that must be recited within documents to create a single, integrated transaction. An examination of the documents is sufficient to establish their interconnections beyond peradventure; the numerous cross-references within the documents are sufficient to show their linkage. The test is whether the documents are "designed to effectuate the same purpose." TVT Records, 412 F.3d at 89. Since the outset of the Westmont transaction, the

parties had a single, overriding purpose -- Westmont's assumption of a substantial stake in the Company in exchange for financing the Parq project. The PPA and the five financing agreements reflect and effectuate that common purpose.

In sum, the Company has failed to raise a question of fact to defeat the Valtus motion for summary judgment. The Company ignores that each financing agreement was a piece of a single, larger transaction; all were executed to secure financing for the Company's project in exchange for equity and board control. The only reasonable construction of the PPA's term "equity-linked securities," viewed within that context, is one that includes the Second Lien Loan and the First Interim Advance.[9]

II. Extrinsic Evidence

Even if the Company were able to locate an ambiguity in the PPA, Valtus asserts that extrinsic evidence resolves the ambiguity in its favor. Valtus is correct.

The extrinsic evidence includes the parties' communications with each other and their course of dealing throughout the

[9] The Company also asserts that Valtus's position that the Westmont transaction was a single sale of securities is belied by Valtus's motion for partial final judgment pursuant to Rule 54(b), Fed. R. Civ. P. This argument is misplaced. Valtus was due its fees at the close of each stage of financing. Its desire to get immediate access to those fees that the Company conceded that it owed does not suggest that Valtus did not believe it was also entitled to be paid even more in fees.

Westmont transaction. A "course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting" the operative agreement. Restatement (Second) of Contracts § 223(1) (1981). "Course of dealing may become part of an agreement either by explicit provision or by tacit recognition . . . ." Id. at cmt. b. The course-of-dealing doctrine has been extended to "include evidence that a party has ratified terms by failing to object," provided there is "an indication of the common knowledge and understanding of the parties." New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997). Summary judgment is appropriate where the course-of-dealing evidence "is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004) (citation omitted). Extrinsic evidence regarding the meaning of contract terms is received to determine the parties' intent at the time they executed the contract. Olin Corp. v. Ins. Co. of N. Am., 221 F.3d 307, 319 (2d Cir. 2000).

As described above, the Company and its representatives repeatedly acknowledged and represented that Valtus would receive a fee calculated on the basis of the entirety of the Westmont transaction. It made such representations to Valtus,

to Westmont, and to third parties. These communications were clear: Valtus and Credit Suisse were due 4.25% of the full value of the Westmont investment.[10]

In an effort to avoid this record, the Company argues that it was "not focused" on Valtus's fees.[11] That argument is sharply at odds with the Company's repeated representations to Valtus, Credit Suisse, Westmont, and others that the investment banking fee would be 4.25% of the total amount of the Westmont financing. These representations include Morphy's May 2018 explanation of the proposal, Dundee's June 2018 financial analysis, the October 2018 presentation to Marriott, the

---

[10] The Company briefly argues that Valtus authored much of the correspondence in which the Valtus fee is calculated by reference to the full Westmont transaction. Even if true, the correspondence reflects that the Company did not object and understood the methodology being used. In any event, the Company authored its own acknowledgements that the fee had to be calculated using the entirety of the Westmont investment in the transaction.

[11] To support the argument that the Company was "not focused" on the investment advisor fees, the Company relies on the depositions of the COO and CEO of Dundee. When confronted at their depositions with Company documents from late-2018 and early-2019 calculating the fees as 4.25% of the entire Westmont transaction they each testified that they were not personally focused on that issue at that time because they were concerned about securing essential funding to save the entire one billion dollar property and to prevent it from going into receivership. This carefully cabined testimony would not permit a fact finder to conclude that there is a question of fact about the significance and reliability of the many Company representations to Valtus and others during 2018 and 2019 about the fee.

December 2018 PBC board presentation, Morphy's December 2018 cash flow analysis, and the Company's February 2019 updates for Westmont and PWC.[12]

It is true that in some internal communications Company executives explored whether the PPA required only that Valtus be paid on the tranches that converted to equity.[13] In the course of these discussions, the executives occasionally proposed different figures for the Valtus fee. Valtus, however, was not privy to the Company's internal discussions. The Company never provided Valtus with a different methodology for calculating the fee owed to the investment bankers or a different calculation of its fee. In its communications with Valtus, the Company calculated the fee as 4.25% of the full financing amount. The Company's internal deliberations about whether the Company could avoid the payments due under the PPA do not, therefore, shed light on the parties' shared understanding of the PPA or on its plain meaning.[14]

---

[12] While the Company noted to Westmont and PWC that it considered the full fee calculation to be the "worst case scenario," and offered alternative fee amounts, it did not contemporaneously convey these alternatives to Valtus.

[13] For example, in one document the Company expressed a desire to "renegotiate[]" Valtus's fee to clarify that the Company owed a fee only on the converted equity.

[14] The Company points to an October 2018 email from Morphy to the Company's executives wherein he states that he conveyed to Valtus his view that Valtus would not earn its fee under the PPA

The Company principally relies upon four communications it had with Valtus beginning in late 2018, about a year after the PPA was executed, to assert that the extrinsic evidence raises a question of fact regarding whether the parties intended at the time they entered the PPA that the investment banking fee would be 4.25% of the entire Westmont investment. These communications do not, however, raise a question of fact regarding the meaning of the PPA.

The Company points first to a Company email discussing a November 2018 draft amendment to the PPA. The draft amendment, which was never adopted, principally addressed whether another entity, CBRE, could share in the 4.25% fee. A Paragon representative then asserted in the internal email that this draft amendment was prepared, in part, to ensure that Valtus and Credit Suisse were paid fees on the entire Westmont transaction. Among other things, the draft amendment revised the definition of gross proceeds in the section of the PPA addressed to compensation. It proposed replacing the definition of gross proceeds as "the price paid for Securities" with "the aggregate

---

"until there was an equity component [to the Westmont transaction] (i.e., when [Westmont] got approved by the [Gaming Policy and Enforcement Branch])." Even assuming that the Company will be able to show at trial that this document accurately conveys Morphy's conversation with Valtus, it is a discussion of the timing of the payment to Valtus. It does not reflect a dispute over the amount of the payment.

price actually paid." While the draft amendment more directly required the Company to pay a fee amounting to 4.25% of the Westmont investment by eliminating the need to construe the term "equity-linked securities," it did not alter the PPA's requirement that the investment banking fee was 4.25% of the gross proceeds of any Private Placement. As the Company's email explains, the draft "relates to closing a loophole to ensure that bankers are paid 4.25% of all Westmont money (including that which will remain at PHLP debt)." If anything, the Company's email reflects its understanding that the investment banking fee was always intended to be 4.25% of the Westmont investment.

Next, the Company asserts that in November 2018 internal communications, Valtus "conceded" that the First Interim Advance was not equity-linked. In an internal email, Valtus's senior vice president states: The First Interim Advance "is not explicitly 'equity-linked' in the same way the [Bridge Loan] was, other than that it can convert into additional principal of the second lien loan." This email does not preclude summary judgment. In fact, it captures the reason that the First Interim Advance is equity-linked. The First Interim Advance was equity-linked because it merged into the principal of the Second Lien Loan, the closing of which was a condition precedent to

Westmont's acquisition of equity.[15]

The Company next relies on an affidavit from Paul Bouzanis, PBC's CEO, wherein Bouzanis recites a conversation he had in the late fall or early winter of 2018 with Valtus's CEO. Bouzanis reports that in that conversation Valtus again communicated its view that its fee was based on the entire amount of the Westmont transaction. Bouzanis states that he then explained that the Company disagreed and that in its view, under the PPA, Valtus would only earn a fee for a portion of the Westmont transaction "that was equity or equity-linked."[16] In this connection, the Company also points to a December 19, 2018 email from Valtus to Credit Suisse referring to a conversation with Bouzanis that same day. That email reports that Bouzanis explained that PBC was "close to buying out Paragon" and "proposed this concept" that the investment bankers get paid on equity and not the debt, that is, "60 million and not 200." The recited conversations do

---

[15] Morphy represented that Valtus was due a fee on the First Interim Advance in his December 2018 cash flow analysis for Westmont and Canadian regulators. Morphy noted that "there is question over what should be paid for as debt and what should be paid on equity" and states the Company "hopefully will not have to pay the full amount." But he does not state that the Company actually disputed the fee calculation or that this "question" was contemporaneously conveyed to Valtus.

[16] Valtus disputes that this is an accurate recitation of the conversation. Valtus asserts that the exchange was focused on the timing of Valtus's payment.

not raise a question of fact regarding the meaning of the PPA. They suggest only that roughly a year after the PPA was executed the Company wished to renegotiate Valtus's fee arrangement, a fact that Valtus does not contest.

Finally, the Company relies on its March 29, 2019 revised schedule of "sources and uses." The Company prepared this schedule in response to a February 25, 2019 request from Credit Suisse for immediate payment of amounts outstanding. Following that inquiry, the Company debated internally how to respond. Company executives discussed whether Parq had the cash to make the payments due and whether they could defer some fee payments because some of the investment did not have an equity link "as yet." One executive noted that it would be unfair to delay paying the fees until Westmont's investment converted to equity. Another noted that the Westmont would bristle at more of its investment going to the investment bankers. The Company then sent Valtus and Credit Suisse the March 29 schedule. While the earlier sources and uses schedules had reflected investment banking fees calculated as 4.25% of the entire Westmont transaction, the March 29 schedule listed those fees as "TBD." The decision to list the fees on the March 29 schedule as "TBD" did not, when the relevant context is considered, indicate anything more than the fact that the Company did not wish at that time, many months after the execution of the PPA, to pay

the fees it owed.

In sum, the PPA requires the Company to pay a fee calculated on the entirety of the Westmont investment. Consideration of the extrinsic evidence confirms that reading of the PPA and that understanding of the transaction. In communications with Valtus, Westmont, and other third parties, the Company repeatedly calculated the investment banking fee by reference to the entirety of the CAD $272 million Westmont investment. Those admissions and that course of dealing make plain the Company's understanding of its obligation to pay Valtus and Credit Suisse that figure. That the Company regretted having made that commitment or internally debated, roughly a year later after executing the PPA, whether to adopt a different position does not create a dispute about the meaning of the PPA.

III. Expenses

Finally, Valtus requests summary judgment awarding it USD $34,622.17 for the expenses it incurred while securing the Westmont investment. The PPA unambiguously entitles Valtus to that sum. Section 3 of the PPA provides that the Company will reimburse Valtus for expenses "resulting from or arising out of [the PPA], whether or not any Private Placement is consummated."

The Company argues that Valtus is due expenses for only the tranches of funding that expressly convert to equity. That is

wrong. As the quoted language makes plain, Valtus is entitled to such reimbursement even if there were no investment or equity conversion at all. Moreover, as explained above, the entire Westmont transaction was equity-linked.

**Conclusion**

Valtus's May 29 motion for summary judgment is granted. The defendants' June 29 cross-motion for summary judgment is denied.

Dated: New York, New York
December 15, 2020

DENISE COTE
United States District Judge